## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**EDWARD (TED) FREE**, an individual,

      Plaintiff,

v.

**DAVID KRAMER,** an individual, and
**COLORADO AGRI PRODUCTS, LLC,** a Colorado limited liability company,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff Edward (Ted) Free ("Plaintiff" or "Mr. Free"), by and through his attorneys, hereby submits his Complaint and Jury Demand against Defendants David Kramer ("Mr. Kramer" or "Defendant Kramer"), and Colorado Agri Products, LLC ("CAP") (together, "Defendants"). In support of his Complaint and Jury Demand, Plaintiff alleges the following.

## <u>PARTIES</u>

      1.    Plaintiff is a citizen of the State of Nebraska, and is domiciled in Nebraska.

      2.    Defendant Kramer is and has been at all relevant times, a resident of the State of Colorado, residing in Sterling, Colorado.

      3.    Defendant CAP is and has been at all relevant times, a Colorado limited liability company with its principal place of business located at 450 Angus Ave., Sterling, Colorado 80751.

4.      Defendant CAP has two co-owners, Defendant Kramer, and William Bornhoft. Both members are citizens of, and domiciled in, the State of Colorado.

5.      Upon information and belief, William Bornhoft resides in Sterling, Colorado.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. Plaintiff is an individual domiciled in Nebraska.  Defendant Kramer is an individual domiciled in Colorado.  Defendant CAP is a limited liability company and takes its citizenship from the citizenship of its members.  CAP's members, Mr. Kramer and Mr. Bornhoft, are domiciled in Colorado.  Therefore, complete diversity of citizenship exists.  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

7.      This Court also has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1962, *et. seq.*[1]  This is an action authorized by and instituted under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962, *et. seq.*

8.      This Court additionally has jurisdiction over Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367, as Plaintiff's state and common law claims arise from the same core relationship, parties, and case and controversy as the claim over which this Court has original jurisdiction.

9.      Defendants reside in the judicial district of the United States District Court for the District of Colorado.  Accordingly, venue is proper in this District pursuant to 28 U.S.C. § 1391.

---

[1] Additionally, Plaintiff has initiated the administrative process for his Sarbanes-Oxley Whistleblower retaliation claim and intends to amend this Complaint and Jury Demand once the Occupational Safety and Health Administration certifies his exhaustion of administrative remedies, to include his claim under 18 U.S.C. § 1514A, *et seq.*, over which the Court will also have original jurisdiction pursuant to 28 U.S.C. § 1331.

## GENERAL ALLEGATIONS

10.     Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

### *Background*

11.     CAP was formed in 2004 in order to create and supply feed product for feed yards in eastern Colorado.

12.     In 2004, Sterling Ethanol, LLC ("SE") was formed by Defendant Kramer and others, having its principal office address in Sterling, Colorado.

13.     In November 2005, the SE plant was opened and ground its first bushel of corn. The main responsibility of CAP was to provide management and oversight for the 50 million gallon per year ethanol producer.  Included in those responsibilities was to procure corn for the plant and market all of the feed products the plant produced to local feed yards.

14.     In December 2005, CAP expanded and Defendant Kramer and others formed Yuma Ethanol, LLC ("YE").  CAP became the manager and sole commodities marketer for YE as well.

15.     In 2006, Bridgeport Ethanol, LLC ("BPE") was formed by Defendant Kramer and others as a Colorado limited liability company, with its principal office in Bridgeport, Nebraska. CAP became the sole management company and commodities marketer for BPE.

16.     As part of its contractual obligation to BPE under the Management Agreement entered into between CAP and BPE on September 1, 2007, CAP was to provide BPE with a General Manager to oversee all of BPE's business, plant, purchasing, marketing, and personnel operations.

17.     Plaintiff was hired by CAP to serve as BPE's General Manager in 2007.

18.     During his time as BPE's General Manager, Mr. Free worked tirelessly to grow BPE into what it is today.  Within the first few years of Mr. Free's employment, Mr. Free had built BPE into one of the safest, most reliable, profitable, and efficient ethanol plants in the nation.

19.     Out of the three ethanol plants in the Sterling Ethanol Group portfolio (SE, YE, and BPE), BPE was consistently the safest (deemed one of the safest plants in the United States by ERI Solutions LLC) and the most profitable.

20.     Mr. Free's value to BPE eventually caused CAP co-owner and Manager, William Bornhoft, to request Mr. Free to move to Colorado from Nebraska for the benefit of CAP.

21.     Mr. Free was told that the move would also benefit him because he would ultimately take over the management of all three Sterling Ethanol Group plants, and should therefore purchase property in a location central to the three plants.

22.     Mr. Free and his wife purchased property in Haxtun, Colorado, where they had no family or friends, in reliance on CAP's promises that Mr. Free would eventually take over management of SE, YE, and BPE.

23.     Mr. Free and his family would never have purchased real property in Haxtun, Colorado without the promise of growth within CAP.

### *Misconduct by Defendant Kramer During Mr. Free's Employment*

24.     Mr. Free is the reason for BPE's success, which persisted even despite the countless obstacles Mr. Kramer continued to make for BPE and Mr. Free throughout Mr. Free's employment.

25.     Mr. Kramer is 50% owner of CAP, as well as the General Manager, President, Board Manager, and just within the past eight months, also the Operations Director, for both SE and YE, and the President, Board Manager, and within the past eight months, Operations Director, for BPE.

26.     Mr. Free endured years of abuse, harassment, and intimidation under Mr. Kramer's thumb.

27.     During Mr. Free's employment as BPE's General Manager, Mr. Kramer repeatedly attempted to sandbag BPE for the benefit of the SE and YE plants, over which Mr. Kramer serves as General Manager.

28.     As an example, after BPE was given the distinction of being one of the top five safest ethanol plants in the nation several years in a row, Mr. Kramer pushed all of the accidents that occurred at YE over to SE's logs in order to manipulate plant records and receive a higher safety distinction for YE than BPE.

*Personal Racing Sponsorships for Defendant Kramer from SE, YE, and BPE Vendors*

29.     Additionally, in or around 2018, after suspicions that Defendant Kramer and Kramer's personal car racing entities, Kramer Racing, Sterling Racing Team, Deric Kramer Pro Stock Racing Team, American Ethanol Racing Team, and Kramer NHRA ProStock Drag Racing Team, were receiving direct kickbacks on overcharged products BPE was being forced to purchase by Defendant Kramer for the plant, Mr. Free began comparing vendor pricing for products used by BPE.

30.     Nearly immediately, Mr. Kramer used strong-arm and intimidation tactics against Mr. Free to stop him from comparing vendor prices.

31.     In February 2018, Mr. Kramer insisted that Mr. Free attend the Sterling Racing Team's annual end-of-race-season trip in Coronado, California, which was fully financed by BPE, YE, and SE vendor and Sterling Racing Team sponsor, Novozymes (including flights, hotel rooms, meals, drinks, swag bags, etc.).

32.     During the trip, Mr. Kramer demanded that Mr. Free join Mr. Kramer and Larry Baucke, Chairman of the BPE Board of Managers, for pre-dinner drinks to discuss business.  Mr. Free's initial attempt to decline was rebuffed.

33.     Mr. Free knew that Mr. Kramer's agenda was to threaten and intimidate Mr. Free into stopping his comparison shopping for BPE vendors.  Mr. Kramer wanted Mr. Free to blindly accept Mr. Kramer's choices for vendors and suppliers because Mr. Kramer's car racing team sponsorships were directly tied to the size and dollar amounts of annual orders from those vendors, which resulted in BPE being substantially overcharged for product that should have been competitive in the market.

*Obscene Texts and Photo/Video sent to Mr. Free's Wife to Silence Mr. Free*

34.     In an attempt to silence Mr. Free, Mr. Kramer and Mr. Baucke each sent a sexually explicit GIFs/video directly to Mr. Free's wife, Suzie Free, on her work cell phone.

35.     From California, Mr. Kramer texted Suzie Free, who was in Nebraska at the time, the message: "Can you tell Ted to get out of the hot tub and go eat with us????" and sent a photo of a naked woman in a bathtub masturbating.

36.     From California, Mr. Baucke texted Suzie Free, who was in Nebraska at the time, the message: "Ted's still playing the water" and sent a photo of a woman being doused with water wearing a white low cut tank top, with her bare nipple exposed.

37.     Mr. Baucke had never once texted Ms. Free before this date, and had never been given her cell phone number by Mr. Free, nor Suzie Free.

38.     Mr. Free was not copied on Mr. Kramer's and Mr. Baucke's texts to Suzie Free; Mr. Free was informed of the texts only by Ms. Free.

39.     Mr. Kramer sent the obscene text, and directed Mr. Baucke to send an obscene text, to Ms. Free as a threat to Mr. Free to stop comparing vendor pricing, which was threatening the end of Mr. Kramer's receipt of personally beneficial kickbacks and gifts from BPE's existing vendors (undisclosed to the BPE Board) in exchange for BPE paying inflated prices for its products.

40.     Mr. Kramer sent the obscene text, and directed Mr. Baucke to send the obscene text, to Ms. Free, in furtherance of continuing his secret personally beneficial financial scheme.

*Falsifying Documents to Cover-up Undisclosed Personal Financial Benefits from Vendors*

41.     In December 2018, Patrick Denton, Strategic Account & Marketing Manager for Novozymes Bioenergy emailed Mr. Free the "Sterling Group Contract" which is a five-year Enzyme & Yeast Supply Agreement between Novozymes and SE, YE, and BPE.

42.     Attached to the Novozymes Supply Agreement was the "Kramer Racing American Ethanol NHRA ProStock Sponsorship" agreement, which promised cash sponsorships ranging from $225,000 to $400,000 per year to "the American Ethanol #52 Kramer NHRA ProStock Drag Racing team" based on "total spend" for the "Sterling Group" of Novozymes products.  Total customer spend with Novozymes was not permitted to drop below $8,000,000 in any single contracted year, but was expected to maintain around $10,000,000 annually.

43. The Kramer Racing American Ethanol NHRA ProStock Sponsorship agreement was signed by Defendant Kramer as President & Chairman of the Board, Sterling Ethanol, LLC, President & Chairman of the Board, Yuma Ethanol, LLC, President & Chairman of the Board, Bridgeport Ethanol, LLC, and Owner, Kramer Racing.

44. The Kramer Racing American Ethanol NHRA ProStock Sponsorship agreement was not disclosed to Mr. Free by Mr. Kramer, nor to the Board of Managers for BPE.

45. After receiving the Novozymes Supply Agreement and the Kramer Racing American Ethanol NHRA ProStock Sponsorship agreement from Mr. Denton, Mr. Free told Mr. Kramer that he needed to disclose this arrangement to the Board of Managers for BPE.

46. Mr. Free was told by Mr. Kramer that the Board was already aware of the arrangement, and it was all being handled by Mr. Kramer.

47. Upon information and belief, the Board for BPE had not been informed of the Kramer Racing American Ethanol NHRA ProStock Sponsorship agreement by Mr. Kramer.  Mr. Free continued to insist Mr. Kramer disclose his personal financial interests and conflicts of interest to the Board.

48. On or about February 25, 2019, after continued insistence of self-disclosure by Mr. Free to Mr. Kramer, Mr. Kramer wrote a memo addressed to the Board of Directors for SE, YE, and BPE, which purported to disclose his Sterling Racing Team sponsorships.  The memo listed five sponsors for 2019, which, upon information and belief, did not include all of Mr. Kramer's race team sponsorships.

49. Attached to Mr. Kramer's memo, among other items, was an altered American Ethanol NHRA ProStock Sponsorship agreement.  The altered agreement was now signed by

Mr. Kramer's son, Deric Kramer, who was identified as the Owner of the Sterling Race Team. The date of Deric Kramer's signature was the same date of Defendant Kramer's signature on the original American Ethanol NHRA ProStock Sponsorship agreement sent to Mr. Free by Novozymes in December 2018, but Defendant Kramer's name and various titles were entirely removed in the altered agreement.

50.     Upon information and belief, Defendant Kramer fraudulently altered, using a computer connected to the internet, the American Ethanol NHRA ProStock Sponsorship dated September 5, 2018, for the purpose of defrauding SE, YE, and BPE's Boards of Managers, BPE's investors, and Mr. Free.

51.     Mr. Kramer distributed, upon information and belief via mail and/or email, the falsified document, upon information and belief using a computer connected to the internet, in order to commit fraud and for his own personal financial benefit.

*Refusal to Allow Competitive Vendor and Supplier Selection*

52.     On another occasion, Mr. Free wanted to use a new yeast product at the BPE Plant.  Mr. Free was offered a "trial" period to test out a new yeast product from a different supplier.  At the time, Mr. Kramer had directed that BPE and the other two plants use Lallemand yeast in its production of ethanol.

53.     Mr. Free ended up completing the "trial" period with the new yeast, and the results were substantially similar to results using Lallemand yeast, with the exception that the new yeast product resulted in fewer infections than the Lallemand yeast.

54.     Mr. Free completed diligence in comparing prices of the two competing yeast products and discovered that using the new yeast would result in an annual savings, just for the

purchase of yeast for the BPE plant, of $670,000, as compared to what BPE was paying to Lallemand.

55.     Mr. Free informed Mr. Kramer that he was switching products immediately, due to the savings, and instructed Mr. Kramer that he should look into doing the same for SE and YE.

56.     Mr. Kramer told Mr. Free that Mr. Free was not authorized to switch products for BPE and indicated that Mr. Kramer would take care of the issue himself.  The next day, Mr. Kramer told Mr. Free that he spoke to Lallemand and that the new price for yeast for BPE through Lallemand would be discounted by $650,000, annually.

57.     Mr. Kramer's ability to obtain, overnight, an annual reduction in price of $650,000 confirmed that BPE had been grossly overpaying Lallemand for yeast for years, and even after being informed of the overcharging, at Mr. Kramer's direction, continued to overpay Lallemand at least $20,000 annually as compared to competitive products.

58.     Upon information and belief, Lallemand is a sponsor for Kramer's personal car racing entities.  Notably, Lallemand was not disclosed as a sponsor in Mr. Kramer's February 25, 2019 memo to the SE, YE, and BPE Boards.

59.     In June 2020, in retaliation for Mr. Free's due diligence regarding vendor pricing, products, and costs, Mr. Free's Employment Agreement with CAP, dated February 1, 2009, was terminated via letter from CAP's legal counsel.

60.     The reason for termination of Mr. Free's Employment Agreement was retaliation for Mr. Free reporting concerns about Mr. Kramer's racing sponsorships and the undisclosed

*quid pro quo* arrangements for cash sponsorships to the sole financial benefit of Defendant Kramer and his race car entities.

61.     Mr. Free continued his employment as BPE's General Manager on an at-will basis after his Employment Agreement was terminated by CAP.

62.     Despite sabotage and intimidation tactics by Mr. Kramer and his various attorneys, Mr. Free continued to act in the best interests of BPE's investors by researching and comparing competitive products and vendor pricing.

63.     Mr. Free engaged in comparison studies at the BPE plant on various occasions.  In early 2021, Mr. Kramer was fully aware that Mr. Free was conducting another comparison study. After the results of this latest study were in, however, Mr. Kramer told Mr. Free not to report the results to the Board.

64.     Mr. Kramer knew that these particular study results would require BPE to switch to a vendor that did not provide a six-figure kickback sponsorship to Mr. Kramer's personal racing companies.

65.     Mr. Free was determined to report the study results and metrics to the Board, and sent the results to the BPE controller on May 18, 2021, for inclusion in the Board packet for the next Board meeting scheduled for May 25, 2021.

66.     Mr. Free was fired the very next day, on May 19, 2021 (the events of May 19, 2021, are described in detail, infra).

67.     Mr. Kramer was fully aware that Mr. Free had planned to present the study findings to the Board on May 25, 2021.

68. On May 24, the day before the Board meeting, Mr. Kramer instructed BPE's controller to remove the study results and metrics from the Board packet. Upon information and belief, Mr. Free's study results were never presented to the Board.

*Forcing Mr. Free to Waste BPE's Assets for Mr. Kramer's Personal Benefit or to the Benefit of SE and YE, and to the Detriment of BPE's Unique Investors*

69. Another example of misconduct by Mr. Kramer during Mr. Free's time as BPE's General Manager is when Mr. Kramer went to an auction to buy a backhoe to use at his personal cabin in Wyoming. After he had the machinery and used it for about a year or two, he forced BPE to buy that same backhoe for the original amount Mr. Kramer purchased it for at auction years earlier. Mr. Free resisted because BPE did not need the backhoe and Mr. Kramer insisted, threatened Mr. Free's employment, and forced the sale.

70. Similarly, YE and SE were constantly trading out parts with BPE. BPE would order new parts/units and SE and YE would take the new parts/units paid for by BPE and trade them out for old, re-furbished parts that barely worked. The new items were not paid for, just traded straight across new in exchange for old/refurbished parts. Mr. Free was sandbagged, and BPE investors were duped.

71. For example, a Natural Gas Odorizer machine was purchased by BPE when the plant was first being built, but ended up not being needed. BPE tried to return the item, but it was a special order so BPE kept it in storage in case SE or YE needed parts. Several years later, YE's Odorizer broke down and YE ended up taking BPE's brand-new unit (which was completely unused and intact). BPE sent an invoice to YE for the Odorizer. When Mr. Kramer found out about the invoice, he made BPE return the payment and told Mr. Free that he would send back the unit and replace any parts that had been harvested from BPE's brand new

Odorizer.  When the Odorizer was eventually returned to BPE (about six months after the returned payment) the unit was trashed.  Parts had been harvested, the unit was filthy dirty, and wires and hoses just hung off like it had been ravaged.  No money was ever paid back to BPE for the Odorizer or any of its harvested parts.

72.     In another instance, BPE bought brand new plates for its heat exchanger (about a $100,000 investment).  Before the plates were installed during BPE's maintenance turn-around shut-down, YE and SE both had their "shut-downs" and had failed to purchase heat exchanger plates for their plants.  They called BPE and asked if they could use the brand-new ones.  Mr. Free agreed on the condition that YE and SE buy the same brand new heat exchanger plates for BPE's upcoming turn-around.  When BPE received the replacement heat exchanger plates, not only were they not new, but they were not even professionally refurbished.  The used exchanger plates had been barely cleaned and re-welded by SE and YE's onsite maintenance team.  When BPE placed these replacement plates into their systems, there was total failure.

### *The Events of May 19, 2021*

73.     Mr. Free's employment came to a dramatic end for him on May 19, 2021, when he was informed via text message he was fired, but only after (unbeknownst to him at the time), Mr. Kramer falsely reported to police that Mr. Free was armed, distraught, and stole a company vehicle, which resulted in a multi-county, multi-jurisdictional manhunt for Mr. Free.

74.     Not one of the statements Mr. Kramer made to the police about Mr. Free was true, however, and Mr. Kramer knew his report was false when he made it.

75.     Importantly, Mr. Kramer never informed Mr. Free that his employment was terminated until more than an hour after Mr. Kramer made his false report to police, reporting a

lie that Mr. Free left the River City Grill in Sterling, Colorado, in a fit of anger after having been fired.

76.   Mr. Kramer falsely and recklessly communicated to the Sterling Police that Mr. Free was first fired from his job, and then immediately after, committed a felony, all in a matter of minutes.

77.   Mr. Free's name and suspicion as a highly distraught, disgruntled, potentially armed man who stole a vehicle, was broadcast across no fewer than four separate cities and counties (Sterling, Colorado; Philips County, Colorado; Sidney, Nebraska; and Cheyenne County, Nebraska), and broadcast to BPE and CAP employees and co-workers, among others.

78.   Mr. Free's CAP and BPE co-workers and employees (many of whom he hired and supervised), were informed of Mr. Free's termination even before Mr. Free was informed.  Mr. Free's reputation has been damaged to an irreparable level.

79.   Mr. Kramer outright lied to Mr. Free about the purpose and nature of the lunch they were set to have on May 19, 2021.

80.   Mr. Kramer knew when the lunch was set for that date that Mr. Free would have to miss his late sister-in-law's memorial on the one-year anniversary of her death, that Ms. Free would be out of town to attend the memorial, and also that Mr. Free was on the backend of an illness.

81.   In response to a direct question by Mr. Free ahead of the lunch, Mr. Kramer told Mr. Free that no one else was set to attend the lunch, where the stated plan was to talk about BPE's plant projections.

14

82.     Mr. Kramer and Mr. Free both agreed that Mr. Kramer would invite his wife and daughter to join the lunch.

83.     Instead of what Mr. Free was expecting to be a light and social lunch with Mr. Kramer and his family, Mr. Free was greeted as soon as he walked into the restaurant by a man who he had never met, but who called Mr. Free by his name.

84.     Mr. Free, being completely blindsided, confronted by a male stranger who was obviously there for Mr. Free, and processing that he had just been lured to this restaurant under false pretenses by Mr. Kramer, immediately turned around and left the restaurant.

85.     Mr. Kramer told Mr. Free not to leave.  Mr. Free, having no obligation or desire to stay in the ambush, promptly left.

86.     Importantly, Mr. Free was not informed his employment was terminated before he left the restaurant, and he was never instructed by Mr. Kramer that we was not authorized to take the vehicle in which he had driven to Sterling from Haxtun (which was his company vehicle and his only means of transportation).

87.     Suspiciously (in hindsight), before the lunch meeting on May 19, Mr. Kramer requested that Mr. Free pick up Mr. Kramer's repaired firearm for him on the way to lunch.  Mr. Kramer asked Mr. Free to do this favor for him, all the while knowing that he was lying to Mr. Free about the nature of the lunch meeting and would be firing Mr. Free that afternoon.

88.     Mr. Kramer maliciously used this information – omitting that he specifically requested Mr. Free bring Mr. Kramer's gun to him – to inform police that he had seen Mr. Free with a firearm earlier that day.  Mr. Kramer knows that Mr. Free delivered Mr. Kramer's gun to him at his request, they both walked upstairs to Mr. Kramer's gun safe in his personal office, and

Mr. Kramer locked the gun in the safe.  This all happened prior to either party heading to the River City Grill for lunch.

89.     Mr. Kramer conspired to set up Mr. Free on May 19, 2021, likely in order to gain leverage and in an attempt to justify Mr. Free's termination which, in reality, was a retaliatory termination for Mr. Free's plan to expose Mr. Kramer's self-dealing, fraud, and racketeering activities to the investors and the BPE Board of Directors just six days later, on May 25, 2021.

### *Mr. Free's Termination from CAP was Retaliatory*

90.     On May 19, 2021, the date Mr. Free was fired, Mr. Kramer was well aware of the case study and comparative metrics Mr. Free was prepared to present to the Board of Directors on May 25, 2021, which would put squarely at risk Mr. Kramer's self-dealings and car racing sponsorships with existing vendors who were overcharging BPE, YE, and SE for product, to the sole benefit of Mr. Kramer's personal endeavors and hobbies.

91.     Mr. Free had been working to increase profits for investors by looking at competitive pricing for its vendors.  In doing so, Mr. Free uncovered that Mr. Kramer had been entering into contracts with suppliers for BPE, YE, and SE to pay inflated prices for product, which would result in certain monetary levels of sponsorships (cash payments), directly to Mr. Kramer's personal businesses and endeavors.

92.     Mr. Kramer's personal dealings and kickbacks from BPE, YE, and SE's suppliers were never fully disclosed to the Board or to investors.  Further, Mr. Kramer falsified records related to the Novozymes sponsorship of Kramer Racing, which falsified record was presented to the Board by Mr. Kramer as the original.

93.     Additionally, after Mr. Kramer was confronted about sponsorships by BPE, YE, and SE's vendors for his personal racing company by the Board, Mr. Kramer submitted a memo purporting to list all of the racing sponsorships to his personal enterprises.  The egregious number of omissions from the list of sponsors constitutes a material misrepresentation by omission to the Board.

### *Continuing Harassment and Disparagement of Mr. Free*

94.     Mr. Kramer continues to disparage and harass Mr. Free.  Mr. Free was informed by a credible source that Mr. Kramer was spreading the lie, in the close-knit Bridgeport community and in the greater ethanol industry, that Mr. Free sexually harassed BPE employee, Kathy Middleton.

95.     Mr. Kramer knows the statement is untrue, which was confirmed untrue by CAP's own legal counsel after an investigation.

### FIRST CLAIM FOR RELIEF
### *Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, et. seq., and Colorado Organized Crime Control Act (COCC), Colo. Rev. Stat. § 18-17-101, et. seq.*
### **(Against Defendant Kramer)**

96.     Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

97.     By and through the conduct describe above, Defendant Kramer has engaged in racketeering activity and/or a pattern of racketeering activity, as defined in RICO and COCC.

98.     Specifically, Mr. Kramer's fraudulent altering of the Kramer Racing American Ethanol NHRA ProStock Sponsorship and subsequent distribution of the falsified document to the SE, YE, and BPE Boards, and to Plaintiff, constitutes a predicate racketeering activity under RICO and COCC, and constitutes mail and/or wire fraud.

99.     Further, Mr. Kramer's sending, and direction to Mr. Baucke to send, sexually explicit and obscene unsolicited texts and photos to Suzie Free on her cell phone, across state lines, in order to intimidate, threaten, and silence Mr. Free into not reporting kickbacks and not reporting suspicions of undisclosed personal financial benefit to Mr. Kramer to the Board, constitutes a predicate racketeering activity under RICO and COCC.

100.     Mr. Kramer's unsolicited obscene text messages and videos to Ms. Free constitute criminal stalking and harassment in Nebraska, where Ms. Free was located when the texts were received, and California, where Mr. Kramer was located when he sent the texts.

101.     Upon information and belief, Mr. Kramer has engaged in additional predicate racketeering activity from which he has personally financially benefited, including falsifying additional documents related to undisclosed sponsorship deals with BPE, YE and SE's vendors.

102.     Plaintiff has been financially affected by Defendant Kramer's RICO and COCC violations.

103.     Mr. Free, as a profit-sharing employee of CAP, was personally affected by all conduct that decreased CAP's profits – including Mr. Kramer's decision to forgo competitively priced products for the benefit of cash sponsorships to his own personal companies and to line his own pockets.

104.     The harm Plaintiff has suffered is a direct result of the above-alleged predicate acts.

105.     Plaintiff seeks damages to be determined at trial, including but not limited to, compensatory damages, treble damages as allowed by statute, costs, attorneys' fees, and pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**
*Wrongful Discharge in Violation of Public Policy*
**(Against Defendants CAP and Kramer)**

106.     Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

107.     As described above, Mr. Free continued to act in the best interests of BPE's investors by researching and comparing competitive products, despite Mr. Kramer's repeated insistence that Mr. Free blindly accept Mr. Kramer's choices for vendors and suppliers that had substantially higher prices and were not competitive in the market in price or output.

108.     Mr. Free understood that Mr. Kramer was intentionally overcharging BPE for products through vendors and suppliers in order to preserve Mr. Kramer's personal cash kickbacks from those vendors and suppliers for Mr. Kramer's personal car racing entities.

109.     Mr. Free knew Mr. Kramer was intentionally misrepresenting the nature and details of his car racing sponsorship agreements to BPE's Board and investors, which Mr. Free believed was unlawful.

110.     Mr. Free completed a comprehensive study of comparison products in order to convince Mr. Kramer and the Board to switch to more competitively priced products for the benefit of BPE, all profit-sharers, the Board, and investors.

111.     Mr. Kramer was fully aware that Mr. Free was conducting the study and upon information and belief, hoped the study would show Mr. Kramer's selected vendors (which provided his personal kickbacks), had superior products and results.

112.     After the results were in, Mr. Kramer told Mr. Free not to report the results to the Board.  Mr. Kramer knew that the study results would require BPE to switch to a vendor that did not provide a six-figure kickback sponsorship to Mr. Kramer's personal racing companies.

113.     Mr. Free sent the study results and metrics to the controller on May 18, 2021, to be included in the Board packet for the meeting on May 25.

114.     When Mr. Free was fired by Mr. Kramer the next day, on May 19, 2021, Mr. Kramer was fully aware that Mr. Free had planned to present the findings to the BPE Board in six days, on May 25, 2021.

115.     On May 24, the day before the Board meeting, Mr. Kramer instructed BPE's controller to remove the study results and metrics from the Board packet.

116.     The close proximity in time between Mr. Free's termination and his intention to report study results that would dismantle Mr. Kramer's undisclosed funnel of kickbacks for his personal car racing teams, suggest that Mr. Kramer fired Plaintiff to silence him and prevent him from presenting his study results to the Board.

117.     Mr. Free reasonably believed that Mr. Kramer's conduct in obtaining undisclosed kickbacks for his personal financial benefit and actively falsifying records to cover up his conduct was unlawful.

118.     Defendants knew or should have known that Plaintiff's refusal to accept Mr. Kramer's overpriced vendors in order to preserve his personal kickbacks undisclosed to the Board was based on Mr. Free's reasonable belief that Mr. Kramer was acting unlawfully.

119.    Defendants fired Mr. Free because Mr. Free refused to stay silent regarding Mr. Kramer's insistence that BPE grossly overpay Mr. Kramer's preferred vendors and suppliers, to the sole financial benefit of Mr. Kramer.

120.    Defendants engaged in the above alleged conduct willfully, maliciously, and/or with reckless disregard to Plaintiff's rights, beliefs, and feelings.

121.    Plaintiff seeks damages to be determined at trial, including but not limited to backpay, economic and noneconomic damages, emotional distress, punitive damages, costs, and pre- and post-judgment interest.

### THIRD CLAIM FOR RELIEF
*Abuse of Process*
**(Against Defendants CAP and Kramer)**

122.    Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

123.    As described above, Mr. Kramer's false report on May 19, 2021, to Sterling Police, for the ulterior purpose of humiliation, disparagement, defamation of Mr. Free's character, and intimidation, constitutes an egregious abuse of process.

124.    Defendant Kramer, by and for CAP and for himself, intentionally falsely reported to police that Mr. Free was armed, distraught, and stole a vehicle, which resulted in a multi-county, multi-jurisdictional manhunt for Mr. Free.

125.    The principal reason for Defendant Kramer's action was other than to report a crime, because no crime had been committed by Mr. Free.

126.    Mr. Free was not even informed he was fired by Mr. Kramer before Mr. Kramer reported to police that Mr. Free was fired and stole a vehicle.

127.     Mr. Free did not steal his company vehicle.  Mr. Free was never informed that he was not authorized to continue using the company vehicle at any time before it was reported stolen to police by Mr. Kramer.

128.     Mr. Free has suffered severe emotional distress and his reputation has been irreparably damaged as a direct result of Mr. Kramer's knowingly false police report on May 19, 2021.

129.     Plaintiff seeks damages based on Mr. Kramer's false report in an amount to be determined at trial, including but not limited to, compensatory damages, damages for emotional distress, damages for loss of reputation, loss of enjoyment of life, punitive damages, and any other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**
***Intentional Infliction of Emotional Distress by Extreme and Outrageous Conduct***
**(Against Defendants CAP and Kramer)**

130.     Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

131.     As described above, Mr. Kramer, by and for CAP and for himself, made a false report on May 19, 2021, to Sterling Police, for the purpose of humiliation, disparagement, defamation of Mr. Free's character, and intimidation.

132.     Defendant Kramer engaged in conduct he knew, or should have known, would lead Plaintiff to suffer emotional distress.

133.     Defendant Kramer engaged in conduct that a reasonable member of the community would regard as atrocious and beyond all bounds of decency, including by publically and falsely accusing Plaintiff of criminal conduct in the small communities in Colorado and

Nebraska where Plaintiff and his wife live and work, and by submitting false information in pursuit of criminal charges.

134.    Defendant Kramer knew that Plaintiff did not have a firearm when he reported to police that Mr. Free could be armed and stole a vehicle.

135.    Defendant Kramer's conduct was extreme and outrageous.

136.    Mr. Kramer acted with reckless disregard for Plaintiff's rights and feelings and with deliberate indifference to the certainty that Mr. Free would suffer emotional distress.

137.    As a result of Mr. Kramer's conduct, Plaintiff suffered emotional distress, fear for his personal safety, anguish, humiliation, loss of enjoyment of life, loss of reputation, and physical distress.

138.    Plaintiff seeks damages to be determined at trial, including but not limited to compensatory damages, punitive damages, costs, and pre- and post-judgment interest.

## FIFTH CLAIM FOR RELIEF
### *Slander Per Se*
**(Against Defendants CAP and Kramer)**

139.    Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

140.    As described above, on May 19, 2021, Defendant Kramer, by and for CAP and for himself, falsely reported to police that Mr. Free was fired from his job, potentially armed, and stole a vehicle, which resulted in a multi-county, multi-jurisdictional manhunt for Mr. Free.

141.    Mr. Kramer's statements on May 19, 2021, to Sterling Police were untrue.

142.    Mr. Kramer published his false statements to others in the vicinity, and his statements were republished to additional law enforcement dispatchers, agencies, officers, Suzie Free, CAP and BPE employees, managers, directors, OnStar technicians, and others.

143.    Mr. Kramer knew his statements were untrue and he made the statements with reckless disregard as to whether they were false.

144.    Mr. Kramer's statements imputed to Mr. Free the commission of a crime and were therefore slanderous *per se*.

145.    Further, Mr. Kramer continues to disparage Mr. Free by spreading an additional lie in the close-knit Bridgeport community and in the greater ethanol industry that Mr. Free sexually harassed BPE employee, Kathy Middleton.

146.    Mr. Kramer knows the statement is untrue and was confirmed untrue by CAP's own legal counsel after an investigation.

147.    Mr. Kramer's statements impute to Mr. Free unchastity and defame Mr. Free in Mr. Free's trade, business, and profession and are therefore slanderous *per se*.

148.    Mr. Kramer's statements are untrue.

149.    Mr. Kramer knew his statements were untrue and made the statements with reckless disregard as to whether they were false.

150.    Plaintiff seeks damages to be determined at trial, including but not limited to damages for loss of reputation, emotional distress, physical and mental pain and suffering, inconvenience, fear, anxiety, embarrassment, humiliation, loss of enjoyment of life, punitive damages, costs, and pre- and post-judgment interest.

**SIXTH CLAIM FOR RELIEF**
*Promissory Estoppel*
**(Against Defendant CAP)**

151.    Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

152.    As set forth above, during his time as BPE's General Manager, Mr. Free had built BPE into one of the safest, most reliable, profitable, and efficient ethanol plants in the nation.

153.    As a result of his hard work, dedication, and objectively outstanding results with BPE, Mr. Free's value to BPE caused CAP co-owner and Manager, William Bornhoft, to request Mr. Free move to Colorado from Nebraska to be closer to the SE and YE plants.

154.    Mr. Free was persuaded to purchase real property in Colorado and he was promised his investment would benefit him because he would eventually take over the management of all three Sterling Ethanol Group plants, and should therefore be present in a location central to the three plants.

155.    Mr. Free and his family would never have purchased property in Haxtun, Colorado without the explicit promise of growth within CAP by CAP's Manager.

156.    Mr. Free and his wife purchased a property in Haxtun, Colorado, where they had no family or friends, in reliance on CAP's promises that Mr. Free would eventually take over management of SE, YE, and BPE.

157.    CAP breached its promise to Mr. Free when it allowed Mr. Kramer to terminate Mr. Free's employment for retaliatory and unlawful reasons.

158.    As a result of CAP's conduct, Mr. Free has been damaged in an amount to be determined at trial, including but not limited to, compensatory damages and such other and further relief as the Court deems just and equitable.

### SEVENTH CLAIM FOR RELIEF
*Civil Theft*
**(Against Defendant Kramer)**

159.    Plaintiff incorporates by reference all allegations set forth above, as if fully set forth herein.

160.    Mr. Free, as a profit-sharing employee of CAP, was personally affected by all conduct that decreased CAP's profits – including Mr. Kramer's personally beneficial decision to forgo competitively priced products for the benefit of cash sponsorships to his own car racing companies and to line his own pockets.

161.    As a profit-sharing employee of CAP, Plaintiff has a possessory interest in the profits of CAP.

162.    As set forth above, Defendant Kramer knowingly exercised possession and control over CAP's profits without authorization, by deception, and in such a way that it is obvious he intended to permanently deprive Plaintiff and other intended profit-sharers, of those profits.

163.    As a direct and proximate result of Kramer's wrongful, improper, and/or deceptive actions, Plaintiff has been deprived of his property and has sustained damages.

164.    Plaintiff seeks damages to be determined at trial, including but not limited to, compensatory damages, treble damages as allowed by statute, costs, attorneys' fees, and pre- and post-judgment interest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for judgment against Defendants Kramer and CAP as follows:

a. Compensatory, incidental, and consequential damages;

b. Economic damages;

c. Non-economic damages for emotional distress, pain and suffering, inconvenience, mental anguish, loss of reputation, loss of enjoyment of life, and other non-pecuniary losses;

d. Equitable and make-whole damages;

e. Statutory and treble damages as permitted by law and applicable statute;

f. Punitive damages as permitted by law and to be determined at trial;

g. Reasonable attorneys' fees and costs;

h. Pre- and post-judgment interest; and

i. Such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted this 16th day of November, 2021.

By:     /s/ *Leah P. VanLandschoot*

Leah P. VanLandschoot, #35723
Amy M. Maestas, #46925
THE LITIGATION BOUTIQUE LLC
1720 S. Bellaire Street, Suite 520
Denver, Colorado 80222
T: 303.355.1942
F: 303.355.2199
lvanlandschoot@thelitbot.com
amaestas@thelitbot.com

**ATTORNEYS FOR PLAINTIFF
EDWARD (TED) FREE**

**Plaintiff's Address:**
2860 Club House Dr.
Gering, NE 69341