**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Case No. 21-cv-3080-WJM-KLM

EDWARD FREE,

     Plaintiff,

v.

DAVID KRAMER,
COLORADO AGRI PRODUCTS

     Defendants.

---

**ORDER GRANTING MOTION TO DISMISS**

---

     Plaintiff Edward Free sues David Kramer and Colorado Agri Products ("CAP")
(jointly, "Defendants") for racketeering, wrongful discharge in violation of public policy,
abuse of process, intentional infliction of emotional distress, promissory estoppel,
slander per se, and civil theft. (ECF No. 10.)  Before the Court is Defendants' Joint
Motion to Dismiss Amended Complaint ("Motion") (ECF No. 12) in which they seek to
dismiss all claims other than slander per se for failure to state a claim upon which relief
can be granted.  (*See id.*)  Plaintiff filed a response (ECF No. 22), and Defendants filed
a reply (ECF No. 25).

     For the reasons stated below, the Motion is granted in part and denied in part.

**I. BACKGROUND[1]**

     CAP is an agriculture and ethanol company located in Colorado.  (ECF No. 10 ¶

---

[1] All citations to docketed materials are to the page number in the CM/ECF header,
which sometimes differs from a document's internal pagination.

11.)   It has relationships with the Sterling Ethanol Group, comprised of three LLCs: Sterling Ethanol, Yuma Ethanol, and Bridgeport Ethanol.  (*Id.* ¶¶ 12–15.)  Part of CAP's relationship with Bridgeport Ethanol included providing a general manager for its ethanol plant, located in Bridgeport, Nebraska.  (*Id.* ¶¶ 15–16.)  During the events that led to this lawsuit, Plaintiff was the general manager of the Bridgeport Ethanol plant and a CAP employee.  (*Id.* ¶¶ 16–20.)  Prior to being fired, Plaintiff was viewed as a rising star and the future manager of all three CAP plants.  (*Id.*)  In anticipation of this future promotion, Plaintiff was encouraged to purchase property central to the three plants, which he did, in Haxtun, Colorado.  (*Id.* ¶¶ 161–62.)

Kramer is a 50% owner of CAP and one of the founders of all of the Sterling Ethanol Group companies.  (*Id.* ¶¶ 12–15, 25.)  Kramer was also general manager, president, and board manager of the Sterling Ethanol and Yuma Ethanol plants during the relevant time.  (*Id.* ¶ 25.)  Kramer's other business interests include car-racing teams Kramer Racing, Sterling Racing Team, Deric Kramer Pro Stock Racing Team, and Kramer NHRA ProStock Drag Racing Team.  (*Id.* ¶ 29.)

As part of his responsibilities as general manager, Plaintiff reviewed the purchase agreements Bridgeport Ethanol had with its suppliers and vendors to ensure it was getting competitive prices.  (*See id.* ¶¶ 41–58.)  But Kramer would not allow Plaintiff to change suppliers, even when the new supplier could offer Bridgeport Ethanol a product of equal quality at better prices.  (*Id.* ¶¶ 33, 52–56.)  In December 2018, Plaintiff received an e-mail from an employee of Novozymes Bioenergy, one of Bridgeport Ethanol's suppliers, with an attached 5-year purchase agreement for enzymes and yeast used in producing ethanol.  (*Id.* ¶ 41.)  Also attached was a sponsorship

agreement signed by Kramer as "President & Chairman of the Board, Sterling Ethanol, LLC, President & Chairman of the Board, Yuma Ethanol, LLC, President & Chairman of the Board, Bridgeport Ethanol, LLC, and Owner, Kramer Racing." (*Id.* ¶ 42–43.)  The sponsorship agreement provided for "cash sponsorships ranging from $225,000 to $400,000 per year" to Kramer's racing teams based on the total spend of the Sterling Ethanol Group entities on Novozymes Bioenergy's products.  (*Id.*)

Plaintiff urged Kramer to self-disclose his conflict of interest, and Kramer responded that the Board of Directors was already aware of it.  (*Id.* ¶ 46.)  This was a false statement.  (*See id.* ¶ 44.)  But Plaintiff insisted, and Kramer eventually wrote a memorandum to the "Board of Directors[2] for Sterling Ethanol, Yuma Ethanol, and Bridgeport Ethanol" and attached the sponsorship agreement with Novozymes Bioenergy.  (*Id.* ¶ 48.)  The disclosures in Kramer's memorandum were incomplete, however, and Kramer fraudulently altered the sponsorship agreement.  (*Id.*)  Rather than being signed by Kramer himself, the version Kramer shared with the Board of Directors was signed by Deric Kramer, his son.  (*Id.* ¶ 49–50.)

Around the same time, Kramer insisted that Plaintiff attend the Sterling Racing Team's annual end-of-season trip to Coronado, California.  (*Id.* ¶ 31.)  Although he knew Kramer intended to intimidate him, Plaintiff agreed.  (*Id.* ¶ 33.)  Part of this intimidation included inappropriate text messages to Plaintiff's wife, who was in Nebraska at the time.  (*Id.* ¶ 34.)  Kramer and the Bridgeport Ethanol Board of

---

[2] The Amended Complaint is unclear on whether the Boards of Directors for the three Sterling Ethanol Group entities are composed of the same individuals or if there is in fact only one board.  And while the Amended Complaint uses "Sterling Ethanol Group" to refer to the three entities collectively, it is unclear whether it is an actual parent company or simply a helpful shorthand for referring to the three entities together.

Managers Chairman, Larry Bauke, each sent sexually explicit text messages to Plaintiff's wife on her work cell phone.  (*Id.* ¶¶ 35–40.)  These messages mentioned Plaintiff and were allegedly intended as a threat.  (*Id.*)

Plaintiff was not deterred from seeking competitive prices on quality supplies to improve the financial performance of Bridgeport Ethanol. (*Id.* ¶¶ 52–55.)  Plaintiff was offered a trial period to test a product from a potential yeast supplier, and after determining that it was of high quality, he informed Kramer that he would be changing Bridgeport Ethanol to the new supplier, resulting in $670,000 in annual savings.  (*Id.*)  Kramer told Plaintiff that he was not authorized to change suppliers, and the very next day, Kramer told Plaintiff that he had secured a discount of $650,000 per year from their current supplier.  (*Id.* ¶ 57.)  Plaintiff believes that Kramer prevented him from changing suppliers because Kramer had a racing sponsorship with the yeast supplier and that Kramer's ability to quickly negotiate huge annual savings is evidence that Bridgeport Ethanol was "grossly overpaying" for yeast so that Kramer could get a kickback via his racing businesses.  (*Id.* ¶ 57–58.)  In retaliation for his efforts to save Bridgeport Ethanol money by forcing suppliers to compete for their business, Plaintiff's employment contract with CAP was terminated.  (*Id.* ¶ 59.)  After this point, Plaintiff continued as an at-will employee.  (*Id.*)

Plaintiff was still not deterred.  He prepared another vendor comparison study but, once the results were in, Kramer ordered Plaintiff not to report the results to the Board of Directors.  (*Id.* ¶¶ 62–63.)  Plaintiff believes Kramer did this to protect his racing teams' sponsorship arrangements with current vendors.  (*Id.* ¶ 64.)  On May 18, 2021, Plaintiff sent the results to Bridgeport Ethanol's controller to include them in the

packet for the next Board of Directors meeting on May 25, 2021.  (*Id.* ¶ 65.)  On May 19, 2021, Plaintiff was invited to a restaurant in Sterling for what he thought was a social lunch with Kramer.  (*Id.* ¶ 65, 83.)  Plaintiff drove from Haxtun to Sterling in a company vehicle.  (*Id.* ¶ 86.)  Plaintiff was greeted at the restaurant by Kramer and a man he had never seen before.  (*Id.* ¶ 83.)  Before Kramer and the other man could inform Plaintiff that he had been fired, Plaintiff left the restaurant and drove back to Haxtun in the company vehicle.  (*Id.* ¶ 84–86.)

Kramer then reported to the police that Plaintiff had stolen the vehicle and that he had seen Plaintiff with a gun earlier in the day.[3]  (*Id.* ¶ 88.)  This resulted in a "multi-jurisdictional manhunt" for Plaintiff.  (*Id.* ¶ 131.)

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive

---

[3] Plaintiff explains that Kramer had asked him to pick up Kramer's gun, which had been repaired, and deliver it to Kramer at the lunch.  (*Id.* ¶ 87–88.)  Plaintiff suggests that Kramer planned this so that he could report Plaintiff to the police and tarnish Plaintiff's reputation.  (*Id.*)

inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

### III. ANALYSIS

**A.   RICO and COCCA**

Plaintiff sues under both the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.*, and the Colorado Organized Crime Control Act ("COCCA"), Colo. Rev. Stat. § 18-17-101, *et seq.*, the Colorado analogue to RICO, alleging that Kramer engaged in a series of racketeering activity, including fraud, criminal stalking, and knowingly making a false police report.  (ECF No. 22 at 3–5.)

COCCA was patterned after RICO, and while not identical, the two statutes "are similar and are generally construed according to similar principles."  *L-3 Commc'ns*

*Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1076 (D. Colo. 2012) (citing

*Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1125 (D. Colo. 2010));

*Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010)); *People v. Hoover*, 165 P.3d 784,

798 (Colo. App. 2006) ("Absent a prior interpretation by our state courts, federal case

law construing [RICO] is instructive because COCCA was modeled after the federal

act."). The parties treat the two statutes as covering the same ground: Plaintiff pleads

Kramer's alleged violation of RICO and COCCA as a single claim (ECF No. 10 at 17–

18), and the parties discuss the two statutes together in their briefing (ECF No. 12 at 3–

7; ECF No. 22 at 3–5; ECF No. 25 at 2–4). Accordingly, the Court will do the same.

"The elements of a civil RICO claim are (1) investment in, control of, or conduct

of (2) an enterprise (3) through a pattern (4) of racketeering activity. 'Racketeering

activity' is defined in 18 U.S.C. § 1961(1)(B) as any 'act which is indictable' under

federal law." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (internal citations

omitted). Certain state offenses, including "any act or threat . . . dealing in obscene

matter," can also be "racketeering activity." 18 U.S.C. § 1961(1)(A). "These underlying

acts are 'referred to as predicate acts, because they form the basis for liability under

RICO.'" *Tal*, 453 F.3d at 1261 (quoting *BancOklahoma Mortg. Corp. v. Cap. Title Co.*,

194 F.3d 1089, 1102 (10th Cir. 1999)).

The parties dispute what constitutes "racketeering activity" and thus whether

Plaintiff has pleaded a "pattern" of such activity. To properly allege a "pattern," Plaintiff

must allege that Kramer engaged in at least two predicate racketeering acts within a

ten-year period. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.

1991). For the purposes of the Motion, Kramer concedes Plaintiff has alleged one

predicate racketeering act (sending the fraudulent sponsorship contract to the Board of Directors); however, he argues that the other two alleged predicate acts do not constitute "racketeering" as defined by RICO.  (ECF No. 12 at 5.)  Those acts are: (1) the explicit text messages alleged sent by Kramer and Bauke to Plaintiff's wife; and (2) the filing of the false police report by Kramer.  Plaintiff argues that acts are state crimes and, therefore, qualify as predicate acts under § 1961(1)(A).  (ECF No. 22 at 3–5.)

 *Explicit text messages.*  Plaintiff alleges that while they were in California, Kramer and Bauke sent "unsolicited obscene text messages and videos" to his wife.  (ECF No. 10 ¶ 100.)  According to Plaintiff, these text messages "constitute criminal stalking and harassment in Nebraska, where Ms. Free was located when the texts were received, and California, where Mr. Kramer was located when he sent the texts."  (*Id.*)  This allegation is a legal conclusion that is not entitled to the assumption of truth afforded factual allegations at the motion-to-dismiss stage.  *Iqbal*, 556 U.S. at 678.  And while Plaintiff quotes § 1961(1)(A) to support the proposition that obscene conduct constituting a state crime can be a predicate racketeering act, his quotation omits the limitation to such crimes "punishable by imprisonment for more than one year."  (ECF No. 22 at 5; ECF No. 25 at 2.)  Kramer argues that criminal stalking, as a Class I misdemeanor, is punishable by imprisonment for "not more than one year" and therefore cannot constitute a predicate racketeering act.  (ECF No. 25 at 3.)  Though Kramer makes no mention of the penalty for criminal stalking in California, the Court's independent research indicates that it is also punishable by imprisonment for "not more than one year."  Cal. Pen. Code § 646.9(a).  Therefore, the Court finds that the allegedly obscene text messages sent to Plaintiff's wife cannot be a predicate racketeering act.

*False Police Report.*  Plaintiff alleges that Kramer knowingly made a false police report about him, which resulted in a "multi-jurisdiction manhunt."  (ECF No. 22 at 10.) Plaintiff argues Kramer's false police report is a crime in Colorado.  (ECF No. 22 at 4–5.)  Kramer responds that this alleged crime cannot be a predicate racketeering act for the same reason as the alleged criminal stalking.  (ECF No. 25 at 3.)  Citing Colorado Revised Statutes § 18-8-111(b), Kramer argues "the crime of false police reporting is punishable as either a Class 3 or Class 2 misdemeanor, depending on various circumstances."  (*Id.*)  And, as Kramer points out, misdemeanors in Colorado are not punishable by imprisonment for more than a year.  (*Id.*; *see also* Colo. Rev. Stat. § 18-1.3-501.)  Therefore, the Court finds that the allegedly false police report cannot be a predicate racketeering act.

 Plaintiff alleges no other racketeering activity, and therefore has not plausibly alleged a "pattern" of such activity.  The Court also finds that this deficiency is not merely the result of inartful or uncareful pleading.  Rather, the facts as Plaintiff describes them, as well as the underlying state laws, do not support a claim sounding in civil RICO or COCCA.  Because amendment would be futile, the Court dismisses this claim with prejudice.

**B.    Wrongful Discharge in Violation of Public Policy**

Absent an express contract providing otherwise, Colorado law presumes that an employment relationship is terminable at will by either party.  *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 105 (Colo. 1992).  However, termination of employment in violation of public policy is a common law exception to the at-will presumption.  *Id.* at 109.  An employee terminated for refusing to follow his employer's directive to engage in unethical or unlawful conduct can maintain a claim for wrongful discharge.  *Kearl v.*

*Portage Envtl., Inc.*, 205 P.3d 496, 498 (Colo. App. 2008).  Additionally, an employee

terminated for engaging in conduct that is protected or encouraged as a matter of public

policy may also have a viable cause of action.  *Id.*  To prove of a claim of wrongful

discharge in violation of public policy a plaintiff must show:

> (1) the employer directed the employee to perform an illegal
> act as part of the employee's work-related duties or
> prohibited the employee from performing a public duty or
> exercising an important job-related right or privilege; (2) the
> action directed by the employer would violate a specific
> statute related to public health, safety, or welfare, or would
> undermine a clearly expressed policy relating to the
> employee's basic responsibility as a citizen or the
> employee's right or privilege as a worker; (3) the employee
> was terminated as the result of refusing to perform the act
> directed by the employer; and (4) the employer was aware
> that the employee's refusal to perform the act was based on
> the employee's reasonable belief that the directed act was
> unlawful.

*Bonidy v. Vail Valley Ctr. Aesthetic Dentistry, P.C.*, 232 P.3d 277, 281 (Colo. 2010).

Actions protected under the public policy exception are not confined to any one

category of behavior.  Rather, wrongful discharge in violation of public policy "has been

variously described as an action that involves a matter that affects society at large

rather than a purely personal or proprietary interest of the plaintiff or employer, leads to

an outrageous result clearly inconsistent with a stated public policy, or strike[s] at the

heart of a citizen's social rights, duties, and responsibilities."  *Crawford Rehab. Servs. v.*

*Weissman*, 938 P.2d 540, 552 (Colo. 1997) (internal quotation marks and citations

omitted).  In short, an employer is not permitted to fire an employee in contravention of

an important public policy, and, as a corollary, an employee should not be forced to

choose between violating the law or losing his job.  *Lorenz*, 823 P.2d at 109.

Defendants argue that Plaintiff has failed to properly allege three of the four

required elements from *Bonidy* (ECF No. 12 at 7), but they focus particularly on the second element.  (*See id.* at 7–9.)  The Court will first briefly address the Motion's arguments concerning the first and fourth elements.  Defendants argue in the Motion that Plaintiff fails to allege that the act Plaintiff was directed to carry out was illegal. (ECF No. 12 at 8.)  Plaintiff responds, however, that Kramer directed him to assist Kramer's illegal anticompetitive conduct.  (ECF No. 22 at 5–6.)  Defendant tacitly concedes this, and the Court agrees that Plaintiff has properly alleged this element. (ECF No. 25 at 4.)  Defendants also argue the conclusory allegation that Plaintiff "refus[ed] to comply with [the] directive to continue Mr. Kramer's cover-up . . . was based on Mr. Free's reasonable belief" that it was illegal should be ignored.  (ECF No. 10 at 23; ECF No. 12 at 9.)  The Court agrees that this allegation merely parrots the fourth element of Plaintiff's claims, rather than alleging facts that plausibly support that Defendants had the required knowledge.

Defendants argue Plaintiff fails to allege that being prevented from providing the Board of Directors with his vendor analysis implicates "a specific state statute related to public health, safety, or welfare" or a "clearly expressed policy relating to his basic responsibility as a citizen or his rights or privileges as a worker." (*Id.* at 9.)  In response, Plaintiff points to the Sherman Act and Colorado's antitrust statute.   (ECF No. 22 at 6– 7.)  Plaintiff argues that these antitrust laws establish a public policy against anticompetitive business practices, thereby satisfying the second element.  (*Id.*)  This argument misses the mark because Plaintiff makes no effort to connect this public policy to either his basic responsibility as a citizen or his rights and privileges as a worker.  *See Jaynes v. Centura Health Corp.*, 148 P.3d 241, 246 (Colo. App. 2006).

At bottom, Plaintiff's claim is that he was fired for blowing the whistle on Kramer's self-dealing and illegal anticompetitive conduct.  In theory, this could be a classic claim of wrongful discharge in violation of public policy.  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 667 n.2 (Colo. 1999).  Though Plaintiff has failed to plead a plausible claim in his current complaint, he could well do so in a further amended complaint.  Therefore, this claim is dismissed without prejudice.

## C.    Abuse of Process

Defendants also move to dismiss Plaintiff's abuse of process claim.  (ECF No. 12 at 9–10.)  "In Colorado, abuse of process requires proof of (1) an ulterior purpose in the use of judicial proceedings; (2) willful actions by a defendant in the use of process that are not proper in the regular conduct of a proceeding; and (3) damages."  *Hewitt v. Rice*, 154 P.3d 408, 414 (Colo. 2007).

Plaintiff's abuse of process claim is based entirely upon Kramer's alleged filing of a knowingly false police report.  Defendants argue that a police report is not a "judicial proceeding" and therefore cannot support an abuse of process claim.  (ECF No. 12 at 9–10.)  Despite Plaintiff's protestation that this reading "elevates form over substance," the Court agrees with Defendants.  Formalism may have its drawbacks, but this Court refuses to stretch the scope of "judicial proceedings" beyond its obvious meaning.  *See proceeding*, Black's Law Dictionary, (11th ed. 2019) (defining "judicial proceeding" as "any court proceeding").  Because there appears to be no set of facts Plaintiff could plead to sustain his claim of abuse of process, the Court dismisses this claim with prejudice.

## D.    Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress (also known as

outrageous conduct), a plaintiff must allege sufficient facts to show: "(1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; (3) causing the plaintiff to suffer severe emotional distress." *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 966–67 (Colo. App. 2009).  In Colorado, "[t]he tort of outrageous conduct was designed to create liability for a very narrow type of conduct."  *Green v. Qwest Servs. Corp.*, 155 P.3d 383, 385 (Colo. App. 2006).  Consequently, the level of outrageousness required to create liability is extremely high.  Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient.  Only conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community, will suffice.  *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003); *see also Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (facts must so arouse resentment against the defendant in average members of the community as to lead them to exclaim, "Outrageous!").

Defendants argue that "courts in Colorado do not view [filing a false police report] . . . as sufficiently outrageous to sustain a claim for IIED."  (ECF No. 12 at 11.)  In support, they cite *Goodwins v. Valet, LLC*, 2013 Colo. Dist. LEXIS 2836 (Colo. Dist. Ct. 2013).  In *Goodwins*, the plaintiff alleged the defendant falsely reported to the police that he had seen the plaintiff driving.  *Id.* at *2.  As a result, the plaintiff was arrested (though ultimately not charged) for driving under the influence, and his license was revoked.  *Id.* at *2, *20–21.  The court noted that courts in various jurisdictions have disagreed on whether filing a false police report can constitute "outrageous conduct."  *Id.* at 19.  It

then held that reasonable minds could not differ on whether the conduct challenged in that case was outrageous, relying primarily on the fact that (1) defendant made a reasonable inference that plaintiff had driven based on what he saw and (2) the police performed their own independent investigation that resulted in plaintiff's arrest.  *Id.* at *20–21.  Notably, the defendant in *Goodwins* did not report that plaintiff was drunk.  *Id.* at *2.

Plaintiff argues that Defendants play down the impact of Kramer's allegedly false police report and ignore that it directly led to a "multi-jurisdictional manhunt."  (ECF No. 22 at 10–11.)  He also draws out important context.  Kramer was Plaintiff's boss and the owner of the company he worked for.  (*Id.*)  And the crime Kramer allegedly falsely reported was the theft of a company vehicle.  (*Id.*)  In *Goodwins*, the defendant reported that plaintiff was driving but not that plaintiff was drunk or committed any crime at all.  2013 Colo. Dist. LEXIS 2836, at *2.  Here, Plaintiff was accused of stealing his employer's vehicle, which is a felony.  *See* Colo. Rev. Stat. § 18-4-409.  Plaintiff also alleges that the lie that he stole the company vehicle was spread to his colleagues at Bridgeport Ethanol in Nebraska.  (ECF No. 22 at 11.)  It is entirely foreseeable that falsely reporting Plaintiff had committed felony theft, both to the police and to his business colleagues, would result in a police search and substantial injury to Plaintiff's reputation in the community.  And it is also foreseeable that this would result in significant emotional distress for Plaintiff.  In fact, Plaintiff alleges that was the point. (*See* ECF No. 10 ¶¶ 137–45.)

After reviewing Defendants' legal authority and comparing the facts of that case to the allegations in the Amended Complaint, the Court finds that Plaintiff has alleged a

plausible claim for intentional infliction of emotional distress.

**E.    Promissory Estoppel**

To prevail on his promissory estoppel claim against CAP, Plaintiff must show: (1) CAP made a promise to Plaintiff; (2) CAP reasonably should have expected that the promise would induce action or forbearance by Plaintiff; (3) Plaintiff reasonably relied on the promise to his detriment; and (4) the promise must be enforced to prevent injustice. *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006).

Plaintiff alleges that CAP promised he would "eventually take over the management of all three Sterling Ethanol Group plants."  (ECF No. 10 ¶ 161.)  Because two of the three plants are located in Colorado, he was encouraged to purchase a home in northeast Colorado.  (*Id.* ¶¶ 162–63.)  He and his wife ultimately purchased a home in Haxtun, Colorado because it was central to the three CAP ethanol plants.  (*Id.*)  Plaintiff argues that this purchase was reasonable detrimental reliance on CAP's promise that he would eventually manage all of the plants.  (ECF No. 22 at 11–13.)

As CAP correctly points out, however, the promise that Plaintiff would eventually advance in his career is not definite enough for the Court to enforce or for Plaintiff's detrimental reliance to be reasonable.  (ECF No. 25 at 8–9.)  This factual deficiency is so fundamental that amendment would be futile.  Therefore, the Court dismisses Plaintiff's promissory estoppel claim with prejudice.

**F.    Civil Theft**

"To prevail on [a claim of civil theft] the plaintiff must 'establish that (1) defendant knowingly obtained control over his property without authorization and (2) defendant did so with the specific intent to permanently deprive him of the benefit of the property.'" *Welch v. Saunders*, 720 F. App'x 476, 480 (10th Cir. 2017) (citing *Huffman v.*

*Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009)).

Kramer argues that Plaintiff's civil theft claim fails because he never had a possessory right to any company future profits.  (ECF No. 12 at 13–14.)  Kramer continues that, even if Plaintiff did have such a possessory right, any profits Plaintiff would have a right to would be speculative, unmaterialized, and not "assigned for distribution."  (*Id.*)  Plaintiff responds that he was "a profit-sharing employee of CAP [who] had an ownership interest is CAP's net profits."  (ECF No. 22 at 14.)  He argues that the profit sharing was consideration for his labor as an employee of CAP, and therefore he had a possessory interest in the profits.  (*Id.*)

Based on the allegations in the Amended Complaint, the Court cannot determine whether Plaintiff had a possessory right in CAP's profits.  It is perhaps more likely that profit-sharing determinations would be made once a year and, when Plaintiff was fired, any future profits were still indeterminate; however, it is not hard to imagine another arrangement—perhaps one based on quarterly profits.  Or perhaps Plaintiff was fired after CAP's fiscal year ended but before profit shares had been distributed.  Because Plaintiff's possessory interest in CAP's profits depends on the specific terms of his employment, which are not alleged with sufficient detail in the Amended Complaint, the Court dismisses his civil theft claim.  But because there may be a set of facts that Plaintiff could allege that would plausibly state a civil theft claim, this dismissal is without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS:

1.      Defendants' Joint Motion to Dismiss Amended Complaint (ECF No. 12) is

GRANTED IN PART AND DENIED IN PART as set forth above;

2.     Plaintiff's RICO/COCCA, promissory estoppel, and abuse of process claims are

DISMISSED WITH PREJUDICE;

3.     Plaintiff's wrongful discharge in violation of public policy and civil theft claims are

DISMISSED WITHOUT PREJUDICE;

4.     The Motion is DENIED with respect to Plaintiff's intentional infliction of emotional

distress claim; and

5.     With respect to all claims other than those dismissed with prejudice, Plaintiff is

granted leave to file a motion for leave to file a Second Amended Complaint by

no later than **September 16, 2022**.


Dated this 31st day of August, 2022.

BY THE COURT:


William J. Martinez
United States District Judge